**TEXAS GAS TRANSMISSION CORPORATION, Appellant,**

v.

**BOARD OF EDUCATION OF BALLARD COUNTY, etc., et al., Appellees.**

Court of Appeals of Kentucky.

Nov. 9, 1973.

Ridley M. Sandidge, Sandidge, Holbrook, Craig & Hager, Owensboro, for appellant.

L. M. Tipton Reed, Neely, Reed & Brien, Mayfield, William E. Scent, Keith, Scent, Kirkham & Walton, Hopkinsville, for appellees.

REED, Justice.

The appellant, Texas Gas Transmission Corporation, appeals from a judgment of the Ballard Circuit Court that determines the liability of appellant for the payment of a utility gross receipts license tax for schools authorized by KRS 160.613. Texas Gas argues that the circuit court judgment was erroneous for several reasons. First, it asserts that the statute authorizing the imposition of the tax is unconstitutional in its application to Texas Gas because it constitutes an invalid infringement of the Commerce Clause of the United States Constitution. The other principal contentions concern themselves with alleged improper construction of the statute together with a regulation enacted by the Board of Education and also a claimed erroneous refusal to apply the provisions of the statute to the facts presented which resulted in failure to allow Texas Gas a credit against the asserted amount of tax. We think the judgment of the circuit court was correct except in the particulars later stated in this opinion.

In 1966, the legislature enacted KRS 160.613. That statute in part authorizes the counties of the state acting through their fiscal courts and on the initiative of the school boards located in the counties to levy a utility gross receipts license tax for support of schools of 3 per cent of the gross receipts derived from "the furnishing, within the county, of . . . natural, artificial and mixed gas." The term "gross receipts" is defined as including all amounts received in money, credits, property, or other monies worth in any form, as consideration for the furnishing of the utility, with the exception that amounts received for furnishing energy or energy-producing fuels used in the course of manufacturing, processing, mining or refining to the extent that the cost of the energy or energy-producing fuels used exceeds 3 per cent of the cost of production and amounts received for furnishing any of the "utility which is to be resold" shall not be considered "gross receipts" for the purpose of computing the tax authorized. The statute was attacked on state constitutional grounds and on the federal constitutional grounds of denial of equal protection or

lack of due process in Lamar v. Board of Education of Hancock County School District, Ky., 467 S.W.2d 143 (1971). In that opinion, this court validated the statute as constitutional under the state Constitution and not violative of the due process or equal protection requirements of the federal Constitution. The federal constitutional ground asserted in the case at bar was neither presented nor decided in the Lamar case.

In August 1967, the tax authorized by the statute was imposed in Ballard County. Texas Gas is a pipeline company which purchases gas from producers in Louisiana and Texas and transports it to purchasers in Kentucky and other states. Its business is primarily wholesale, selling gas to pipeline companies and distribution companies for resale. At the time Ballard County imposed the tax, Texas Gas had three direct consumers in Kentucky, one of which was Westvaco (formerly West Virginia Pulp and Paper Company), which operates a paper mill in Ballard County.

Texas Gas and Westvaco entered into a detailed written contract dated August 19, 1968, which contained the following pertinent numbered sections:

Sec. 2.02. Texas Gas agreed to construct and maintain mainline and Special Facilities necessary to deliver gas to Westvaco. (Section 1.01(h) defines special facilities as approximately 32 miles of 10-inch pipeline). Section 3.01. Westvaco agreed to pay an annual charge for the special facilities. Section 8.01. Westvaco agreed to take or pay for certain volumes of gas during the period November 1969 through March 1970. Section 8.02. Westvaco agreed to pay the sum of: (1) A commodity charge (23.5 cents per Mcf=1,000 cubic feet of gas delivered), and (2) a demand charge ($1.50 per Mcf for the first 16,000 Mcf) known as the contract demand. Section 8.03. Westvaco agreed to pay a specified rate for "interruptible gas" defined in Section 4.03 as that gas taken in excess of the contract demand or at a rate greater than 1,000 Mcf per hour. Section 8.08. Westvaco agreed to reimburse Texas Gas for any taxes "in addition to or greater than those . . . levied . . . at the date of the contract."

The utilities gross receipts tax had been levied at the time of contracting. KRS 160.617 permits any utility required to pay the tax to increase its rates in the county in which it pays the tax by 3 per cent, which Texas Gas by its contract agreed not to do. In November 1970, the finance officer of the Ballard County Board of Education notified Texas Gas that it was subject to the 3 per cent tax. Texas Gas replied by letter that its gas "originates in interstate commerce and is exempt . . ." In April 1971, the Board of Education of Ballard County instituted a declaratory judgment action in the Ballard Circuit Court requesting a declaration of the validity of KRS 160.613 and its application to Texas Gas. By agreement the Ballard County Fiscal Court was made a party. Texas Gas was billed for a tax of 3 per cent of the commodities charge and the demand charge, plus penalty. The public authorities did not undertake to seek collection of tax on the amount Texas Gas received for the special facilities. The trial judge filed findings of fact and conclusions of law in which he sustained the contentions of the taxing authorities that the statute was constitutional and was properly applicable to Texas Gas. The trial court further adjudged that Texas Gas owed $62,294.84 in tax, interest and penalties as of the date of its judgment.

Texas Gas asserts that a gross receipts tax levied by a state upon an interstate transaction is an unconstitutional infringement of the Commerce Clause of the Constitution of the United States. From this premise they contend that KRS 160.-613 cannot be legally applied in this instance. The question is, then, whether Kentucky, through its county boards of education and fiscal courts, has power to tax gross receipts from natural gas furnished

by an interstate pipeline carrier directly to an industrial consumer in a county of this state.

■ Under the decision in Panhandle Eastern Pipeline Company v. Public Service Commission of Indiana et al., 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), as modified concerning an unrelated point by the decision in Federal Power Commission v. East Ohio Gas Company, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), the gas furnished by Texas Gas to Westvaco was in interstate commerce. The purpose of the Commerce Clause, however, was not to relieve those engaged in interstate commerce from their just share of state tax burden. See Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823 (1938). Texas Gas concedes that even interstate business must pay its way as was held in Postal Telegraph-Cable Company v. City of Richmond, 249 U.S. 252, 259, 39 S.Ct. 265, 63 L.Ed. 590 (1919).

■ In 1964 the Supreme Court stated in General Motors Corp. v. Washington, 377 U.S. 436, 440, 84 S.Ct. 1564, 1568, 12 L.Ed.2d 430: "It is well established that taxation measured by gross receipts is constitutionally proper if it is fairly apportioned." KRS 160.613, in our view, meets this requirement through its inclusion of the phrase "within the county."

In Southern Natural Gas Corporation v. Alabama, 301 U.S. 148, 57 S.Ct. 696, 81 L. Ed. 970 (1937), the Supreme Court upheld the assessment of an Alabama franchise tax upon the right to do business measured by the amount of capital employed in the state (in that case 564 miles of pipe and other real and personal property located within Alabama all constituting part of Southern's general transmission system) over Southern's objection that the tax placed an impermissible direct burden on interstate commerce. Southern delivered natural gas, which had moved under unregulated gas pressure from Louisiana and Mississippi fields, to three intrastate utilities and one industrial consumer in Alabama. At the point of delivery the gas was reduced in pressure and measured solely to effect delivery. In Memphis Natural Gas Company v. Beeler, 315 U.S. 649, 62 S.Ct. 857, 86 L.Ed. 1090 (1942), the Supreme Court held that Tennessee's tax of 3 per cent of net earnings could be imposed on Memphis Gas, a corporation which produced gas in Louisiana and transported it to Tennessee where it derived the majority of its income from a profit-sharing joint venture with a Memphis utility. In the course of its opinion in this case, the Supreme Court said:

> "This Court has often had occasion to rule that the retail sale of gas at the burner tips by one who pipes the gas into the state . . . is subject to state taxation and regulation." *Id.* at 653, 62 S.Ct. at 860.

In Panhandle Eastern Pipeline Company v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951), Panhandle, an interstate natural gas company, obtained a direct sale contract with Ford Motor Company to deliver gas at its Dearborn plant. A competing company filed a complaint with the Public Service Commission which ordered Panhandle to cease and desist from making direct sales until it received a certificate of public necessity and convenience from the Public Service Commission. Panhandle obtained an injunction against the order. The Supreme Court of Michigan held that the Public Service Commission's order was within the state's regulatory authority despite the interstate character of the sales, and the Supreme Court of the United States affirmed. The language in this opinion which we consider pertinent is:

> "[T]he sale and distribution of gas to local consumers made by one engaged in interstate commerce is 'essentially local' in aspect and is subject to state regulation without infringement of the Commerce Clause. . . . These principles apply to direct sales for individual consumption as well as to sales for domestic

and commercial uses." *Id.* at 333, 71 S. Ct. at 779.

In its argument, Texas Gas lays great stress on the circumstance that the tax is one imposed on gross receipts, as indicative of its invalidity, but we think that is not determinative. Apparently the most recent Supreme Court case involving a gross receipts tax is General Motors v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964). In that case the Supreme Court in a 5–4 decision upheld a state tax on General Motors gross wholesale sales of motor vehicles, parts and accessories delivered within the state, disagreeing with General Motors' claim that the tax was levied on unapportioned gross receipts arising from a transaction which exhibited significant contacts with more than one state. In the earlier case of McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940), New York City imposed a tax of 2 per cent on gross receipts from every sale for consumption of tangible personal property; the tax was imposed on the buyer, with the seller liable only for failure to collect and pay in the tax, a substantially similar situation to that present here by reason of the provisions of KRS 160.617. Berwind-White mined coal in Pennsylvania and sold it to consumers in New York City. The coal was moved by railroad to Jersey City, New Jersey, and by barge to the point of delivery. In upholding New York's gross receipts tax on the sale, the Supreme Court said:

"[T]axation of property, shipped interstate, before its movement begins, or after it ends, is not a forbidden regulation." *Id.* at 47, 60 S.Ct. at 392.

Later in the same opinion the court said:

"[The tax's] only relation to the Commerce [Clause] arises from the fact that immediately preceding transfer of possession to the purchaser within the state, which is the taxable event regardless of the time and place of passing title, the merchandise has been transported in in-terstate commerce and brought to its journey's end." *Id.* at 49, 60 S.Ct. at 394.

"Here the tax is conditioned upon a local activity, delivery of goods within the state upon their purchase for consumption." *Id.* at 58, 60 S.Ct. at 398.

Under KRS 160.613, the taxable event is "the furnishing within the county of gas." It seems to us that that would be a local activity under the language of Panhandle—Michigan Public Service Commission or McGoldrick. In addition, it would also be a sale under the Memphis Gas or the Panhandle—Michigan Public Service Commission opinions.

Upon the foregoing considerations, we specifically hold that gross receipts from sales of gas which has moved in interstate commerce but which is delivered to a Kentucky direct consumer are taxable by the state. A succinct statement of the applicable law is found in the opinion of Justice Douglas in United Air Lines, Inc. v. Mahin, 410 U.S. 623, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973), which case considered a somewhat analogous problem:

"Sales within the State, however, are taxable, though the goods have reached the market by interstate channels. . . . The sales tax in Berwind-White was on the 'transfer of title or possession or both'. . . . And we sustained the tax because of 'a local activity' which we described as 'delivery of goods within the state upon their purchase for consumption,' . . . ." *Id.* at 1195.

■ In our view, the gross receipts tax levied by KRS 160.613 does not constitute an impermissible burden on interstate commerce; it is valid under federal constitutional principles announced with reasonable consistency by the Supreme Court.

■ Texas Gas contends that by reason of a regulation enacted by the Ballard County Fiscal Court, the furnishing of nat-

ural or artificial gas within the county was, in effect, excluded from the definition of "gross income" for purposes of the tax and, therefore, Texas Gas was relieved from responsibility for the payment of the gross receipts utility tax. This contention is ingenious but hardly persuasive. KRS 160.617 provides that the fiscal court may promulgate such regulations as may be necessary for the *collection* of the tax authorized by KRS 160.613. The statute imposing the tax, KRS 160.613, clearly imposes the tax on gross receipts derived from the furnishing within the county of natural, artificial and mixed gas. We need not explore the application of the statute and the regulation to services or commodities other than the furnishing of gas. The legislature did not vest the local taxing units with authority to amend or repeal the statute imposing the tax. It merely vested them with the right to enact administrative regulations providing for the details of the collection of the tax. Cf. First Industrial Plan v. Kentucky Board of Tax Appeals, Ky., 500 S.W.2d 70 (decided September 28, 1973).

Texas Gas also argues that it is entitled to the cost-of-production exclusion provided by KRS 160.613. The statute provides: " 'gross receipts' shall not include amounts received for furnishing energy or energy-producing fuels, used in the course of manufacturing, processing, mining, or refining, to the extent that the cost of the energy or energy-producing fuel used exceeds three per cent (3%) of the cost of production. . . ."

The statutory scheme envisioned that the utility furnisher would pass the tax on to the consumer by raising its rate charged the consumer in a percentage equivalent to the percentage levied as tax. Texas Gas, nevertheless, by written contract with Westvaco, its direct consumer, in effect, agreed to absorb and pay this utility gross receipts tax if it was applicable.

When liability for the tax was asserted, Texas Gas attempted to prove entitlement to the cost-of-production exclusion that in the ordinary course of events would have been claimed and proved by Westvaco. The only evidence introduced to sustain the claimed credit by way of exclusion was the testimony of George Buckley, commercial manager at Westvaco. Texas Gas had not raised the issue in its pleadings and, therefore, the taxing authority had no opportunity to examine Westvaco's books and records for the purpose of meeting this claim.

The taxing authority, however, objected to Buckley's testimony insofar as he purported to give opinion evidence concerning the cost of production. Buckley admitted that the books and records upon which his opinion testimony was based were maintained in New York. An initial analysis of the information to which Buckley testified was prepared by Westvaco's New York tax department. A second analysis was prepared by Buckley for purposes of his testimony in the litigation. Buckley stated that the total production costs to which he testified were "official book figures." From these costs he deducted "exclusions" which he characterized as "my own individual thinking of certain items that could be presented as deductions." The balance represented "production to which the furnishing of natural gas by Texas Gas has contributed." The taxing authority made a continuing objection to his testimony.

The trial judge found that there was no substantial evidence to support Texas Gas's claim concerning the cost of production. On cross-examination the following exchange is illustrative: "Q. This is a summary of what you think these records reflect? A. Yes." While the admission of summaries from numerous items is doubtless permissible, the raw data should be available for inspection by the adversary, and surely the witness who offers the summary should have perused the entire mass of documentary evidence on which the summary is based. Buckley's testimony consists of little more than an analysis of his own based on a summary prepared by someone else. We cannot

fault the trial judge for being unimpressed with the probative value of this evidence.

Texas Gas finally asserts that it is entitled to substantial credits on the amount claimed to be owing by the taxing authority. Texas Gas argues that those portions of the charge made by it to Westvaco as a minimum bill for gas not actually delivered beginning in November 1969 and ending March 31, 1970, should be deducted. It also contends that that portion of its billing to Westvaco designated as "Demand Charge" should also be deducted. A third item "Special Facilities Charge" was excluded by the taxing authority in computing the total amount to which the percentage representing the tax was applied.

According to the evidence, the "Special Facilities" item was to reimburse Texas Gas for the cost of installations made necessary in the county in which Westvaco was located for the purposes of carrying the gas to Westvaco. The Demand Charge, according to the uncontradicted evidence, was for reimbursement for the cost of construction of facilities in Louisiana, Mississippi and Tennessee, to provide capacity in Texas Gas's main line system to move the gas to the Westvaco line south of Mayfield, Kentucky. It would appear that the same reason which caused the taxing authority to exclude the "Special Facilities" charge should also require the exclusion of the "Demand Charge." Although Texas Gas asserts that the so-called minimum bill charge should likewise be excluded, we disagree.

■ We have earlier held that the taxable incident, which insulates the statute from a claim of impermissible infringement of the Commerce Clause of the federal Constitution, is the "furnishing" of gas within the county. At that point, although the gas is delivered in interstate commerce, it then becomes a local activity and loses sufficient nexus with the protection of the federal Commerce Clause to deny the state the right to tax the sale to a direct consumer, and particularly where, as here, in the ordinary course of events the taxing statute itself provides that the amount of the tax can be passed on to the consumer. Regardless of accounting theory, the cold fact remains that if the charge for "Special Facilities" is excluded and if the "Demand Charge" is excluded, then the "minimum" bill charge for a period during which gas is actually furnished, as admitted here, is clearly a charge for the furnishing of the gas to the consumer within the county. We, therefore, conclude that the trial court correctly included the "Minimum Bill" charge for purpose of computation of the tax.

■ Concerning the "Demand Charge," however, we conclude that it should have been excluded. The uncontradicted evidence established that the "Demand Charge" was for recovery of cost of facilities necessary to be constructed in other states. It thereby acquired sufficient nexus to the thrust of the federal Commerce Clause that the taxation of the gross receipts from this activity would, in our opinion, constitute an impermissible infringement of the federal Commerce Clause in the United States Constitution. Cf. Freeman v. Hewit, 329 U.S. 249, 67 S. Ct. 274, 91 L.Ed. 265 (1946). If the taxing authority excluded the "Special Facilities" charge on their own volition, we consider ourselves fortified in declaring the "Demand Charge" excludable for the undeniable reason that the "Demand Charge" possesses a closer nexus to the protection of the Commerce Clause than does the "Special Facilities" charge. We, therefore, direct that the judgment be modified by excluding from the total amount due that portion allocable to the "Demand Charge," including any interest or penalty resulting from its inclusion.

The judgment is affirmed with the exception of the modification directed herein.

PALMORE, C. J., and MILLIKEN, STEINFELD, STEPHENSON and REED, JJ., concur.

OSBORNE, J., not sitting.